IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:13-CR-310 |
| | ) | |
| EDGAR JAVIER BELLO MURILLO, | ) | The Honorable Gerald Bruce Lee |
| | ) | |
| Also known as "Payaso," | ) | Sentencing Date: April 13, 2015 |
| | ) | |
| Defendant. | ) | |

**MOTION FOR ONE LEVEL REDUCTION PURSUANT TO U.S.S.G § 3E1.1(b) AND POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, in accord with the United States Sentencing Commission, *Guidelines Manual*, § 6A1.2 and the policy of this Court, files its position on the sentencing of the defendant, EDGAR JAVIER BELLO MURILLO. The United States moves for a one-level reduction of the defendant's Sentencing Guidelines level pursuant to U.S.S.G § 3E1.1(b) in recognition of the defendant's timely guilty plea. The government has reviewed the Presentence Investigation Report ("PSR") and submits that the correct Sentencing Guidelines range is a period of 360 months to life imprisonment, after a two-level enhancement for obstruction of justice. This defendant stabbed DEA Special Agent Terry Watson to death during a millionaire's ride robbery. United States respectfully submits that a within Guidelines sentence of 65 years of incarceration is appropriate and accounts for each of the factors set forth in Title 18, United States Code, Section 3553(a).

1

I.    **Procedural Background**

On December 19, 2014, the defendant pleaded guilty pursuant to a plea agreement to Count One and Count Three of the indictment charging him with the murder of an internationally protected person, in violation of Title 18, United States Code, Sections 1116(a) and 2, and conspiracy to kidnap an internationally protected person, in violation of Title 18, United States Code, Section 1201(c).  Thereafter, the remaining counts of the Indictment were dismissed.

II.    **Factual Background**

The following is a brief summary of the facts surrounding the DEA Special Agent James "Terry" Watson's murder, including information about the victim and the defendant's involvement in the victim's murder.

   A.  **The Victim, Special Agent James "Terry" Watson**

   **"Terry was on the front line of stopping drugs from getting into our country and to our children."  Paul Watson, Victim Impact Statement.**

Special Agent Terry Watson was a dedicated and long-standing public servant who devoted his entire adult life to protecting the public and the citizens of the United States.  Prior to joining the DEA, Special Agent Terry Watson worked for the Richland Parish, Louisiana Sheriff's Department, the U.S. Army National Guard and the U.S. Marshal's service.  Thereafter, he joined the DEA.  During his 13 years with the DEA, Special Agent Terry Watson stood on the front lines combating drugs, guns, and violence that threaten our country every day.  He volunteered for dangerous assignments that took him all over the world, including Honduras Haiti, Panama, Guatemala, and Colombia.  In addition, he was deployed on three separate occasions to Afghanistan.

In July 2010, Special Agent Terry Watson was assigned to DEA's Cartagena, Colombia Resident Office. In his position, he was also designated as an Assistant Attaché for the United States and was an internationally protected person. At time of his death, he was working on a number of large-scale narco-trafficking matters, including one case that was resolved shortly after his death that involved the seizure of approximately 20,000 kilograms of cocaine, 15 go-fast vessels, and the arrest of approximately 50 individuals.

As his colleagues have described, he was the type of agent who was the first to arrive in the morning and the last to leave at night. He was hard working, smart, and humble – he was a leader and a mentor to many of his fellow agents. Not surprisingly, the night of his death, Special Agent Terry Watson was busy throughout dinner talking and texting with his colleagues to keep track of an ongoing DEA operation.

At the time of his death, he was a 42-year-old, recently married man, who was a 13-year veteran of the DEA. He lived with his wife of four months, Fadia De La Rosa Watson. He was the youngest son of Henrietta and Paul Watson and brother to Scott Watson. As his wife and parents have stated, the loss of Terry has been devastating, it has caused countless sleepless nights wrought with nightmares of Terry's murder, and their existence does not have space for all the pain they still feel about Terry's death. It should also be noted that the death of the victim has been felt not only by his family, but has reverberated throughout the DEA family, the United States Embassy in Bogota, Colombia, and the law enforcement community.

**B. The Conspiracy to Commit "Millionaire's Ride Robberies"**

The defendant was part of an organized group that participated in "Millionaire's Ride" robberies. This group was in operation, in one combination or another, over an extended period of time. These robberies required organization and a clear division of labor. The group typically

used three taxis, and each conspirator played a specific role. Investigation has identified multiple prior victims, all of whom were merely seeking to use the services of a taxi cab to get around the city of Bogota. In addition to organization, these robberies also required a level of betrayal of trust and brutality, as described by prior robbery victims whom these defendants allowed to live. All of these victims were threatened, terrified and left with scars – the lucky ones have scars that are emotional. As evidenced by the actions of the defendants during the kidnapping and robbery of Special Agent Terry Watson, these defendants were willing to disregard the value of human life in exchange for the content of their victims' pockets and bank accounts.

### C. The Kidnapping and Robbery of Special Agent James "Terry" Watson

On or about June 20, 2013, the defendant and Julio Estiven Gracia Ramirez ("Ramirez"), Omar Fabian Valdes Gualtero ("Valdes Gualtero"), Hector Leonardo Lopez ("Lopez"), and Edwin Gerardo Figueroa Sepulveda ("Sepulveda") met to coordinate and conduct millionaire rides. As discussed above, the scheme typically used three taxis and the defendant's role the night of the murder was to enter the cab carrying the victim to rob, hold and gain compliance from the victim. Once the group met, they quickly proceeded to circle the city looking for potential victims. The second taxi encountered some mechanical issues and was unavailable for use in the robbery that the group intended to conduct. Thereafter, the rest of the coconspirators, including the defendant, continued with the agreed plan but with two taxis rather than three.

At approximately 11:00 p.m., Special Agent Terry Watson left a restaurant in Bogota, where he had been dining with DEA and international law enforcement colleagues. He hailed a taxi ("Taxi #1") in the Parque 93 area of Bogota, a popular and affluent neighborhood known for high-end dining and shopping establishments. Ramirez drove Taxi #1 and selected Special Agent Watson as a target for a "millionaire's ride" robbery. Once the victim entered Taxi #1,

Ramirez engaged the victim in conversation in Spanish and determined that Special Agent Terry Watson was seeking a ride to the Marriott Hotel in Bogota. As soon as Taxi #1 began to travel, a second taxi ("Taxi #2"), driven by Lopez, pulled up behind Taxi #1. This defendant, Bello Murillo, and Valdes Gualtero were riding in Taxi #2.

After a short drive, Ramirez alerted the other defendants that Special Agent Terry Watson was to be their next robbery victim. As previously agreed, Ramirez alerted his co-defendants by pumping the brakes of his taxi to act as if it were experiencing engine trouble. Upon receiving the signal, Lopez confirmed his understanding of the plan by flashing the headlights of his car. Taxi #1 then came to a stop, and Taxi #2 pulled up directly behind it. This defendant and Sepulveda got out of the back seat of Taxi #2 and got into the back seat of Taxi #1, one on each side of Special Agent Terry Watson. Sepulveda used a stun gun several times to attempt to incapacitate Special Agent Terry Watson. Special Agent Terry Watson struggled. During the struggle, the defendant stabbed the victim several times in the upper torso with a knife. The defendant inflicted these wounds with such force that the knife penetrated into Special Agent Terry Watson's chest cavity and damaged internal organs, causing severe internal bleeding.

Special Agent Terry Watson was able to break free, but collapsed a short distance from the crime scene. Colombian National Police officers arrived several minutes later. The police put the victim in their vehicle and took him to the hospital, where he was pronounced dead shortly thereafter. The cause of Special Agent Terry Watson's death was blood loss as a result of multiple stab wounds. The manner of death was homicide.

### D. The Victim's Injuries

During the kidnapping and robbery, the victim was hit with fists, shocked with a taser, and stabbed by this defendant a total of four times. The victim was shocked with the taser

approximately three to six times. Thereafter, this defendant stabbed him in the torso. At least two of his wounds were fatal, but it took him approximately an hour before he succumbed to his injuries. He was able to escape from the taxi and run approximately a half a block before he collapsed. He was able to speak initially, but by the time he was evaluated by emergency room personnel they were not able to detect a blood pressure, and he soon succumbed to his injuries, which caused him to lose almost his entire blood volume. The stab wounds inflicted by the defendant caused such significant bleeding inside his chest cavity that Special Agent Terry Watson likely felt like he was drowning, and lived his last moments in pain and fear.

### III. Sentencing Standards

Although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 125 S. Ct. 738, 767 (2005). "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

### IV. Sentencing Guidelines Calculation

The United States concurs in the Probation Office's Sentencing Guidelines calculation, with one exception. The defendant's Guidelines level should be enhanced by two levels pursuant to § 3C1.1 for obstructing or impeding the administration of justice. Pursuant to §

6

3C1.1, there is a two-level enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution of the instant offense of conviction," and "the obstructive conduct related to . . . the defendant's offense of conviction . . . ." U.S.S.G. § 3C1.1. Application Note 4(B) makes clear that committing perjury is squarely within the types of conduct to which this section applies. The Fourth Circuit has agreed. "Application of [§ 3C1.1] is appropriate if the sentencing court finds that the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Quinn*, 359 F.3d 666, 681 (4th Cir. 2004) (internal quotation marks and citation omitted). The Fourth Circuit has specifically upheld the application of § 3C1.1 based on false testimony at a suppression hearing. *See United States v. Akinkoye*, 185 F.3d 192, 205 (4th Cir. 1999).

In the instant case, the defendant testified, under oath, during a hearing on October 6, 2014. During that hearing, the defendant provided perjured testimony regarding the circumstances of his questioning by U.S. agents in Colombia. This perjured testimony included false claims that he was physically assaulted and threatened and that he was unable to read the Spanish language waiver forms that he signed. Indeed, this Court, applying the same standard of proof applicable to the Sentencing Guidelines (preponderance of the evidence) found the defendant's testimony to be incredible for multiple reasons. *See* Memorandum Opinion and Order, Docket No. 213 at 11-13. This was certainly a material matter, as the defendant's false testimony, if believed, could have resulted in the suppression of statements with significant evidentiary value. Likewise, this false testimony, including conjured tears when describing his

7

alleged mistreatment, was willfully intended to deceive. The defendant's sentencing guidelines should be enhanced by two levels.

The Base Offense Level is 43. U.S.S.G. § 2X1.1(a). As set forth above, the Offense Level should be enhanced by two levels pursuant to § 3C1.1, resulting in a total offense level of 45. The defendant has demonstrated acceptance of responsibility and has assisted law enforcement authorities in the investigation by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, his offense level is decreased by a total of 3 points, resulting in a final Offense Level of 43. U.S.S.G. § 3E1.1(a) and (b). The defendant's criminal history is a Category I. Accordingly, the Guidelines range is correctly calculated at 360 months' to life imprisonment.

## V.     Statutory Sentencing Factors

The government submits that a 65-year sentence would be sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a), including: (1) the nature and circumstances of the offense, (2) the need to provide a just punishment for the crime, (3) the need to afford adequate deterrence for such conduct, and (4) the need to avoid unwarranted sentencing disparities.

### A. A Sentence of 65 Years of Incarceration is Reasonable and Appropriate Given the Nature and Circumstance of the Offense.

There is no more serious crime than the taking of a human life. Given the facts of this case, a sentence of 65 years is appropriate and reasonable. The circumstances of this crime involved the violent actions taken by the defendant and his co-conspirators to cause the death of Special Agent Terry Watson. The horrific circumstances of this crime are compounded by the fact that this was not the first time the defendant and his coconspirators set out to kidnap and

8

harm a helpless victim.  *See* PSI at paragraphs 78 – 83.  Indeed, on other occasions, the defendant armed himself with deadly weapons.  *See id.* at 79, 81, 82, 83.  Predictably, on this occasion, the escalating violence exhibited by the defendants resulted in the death of one of his victims.

The defendant played an important role in this organization, and a critical role in the kidnapping of Special Agent Watson.  This defendant alone, however, is responsible for inflicting the wounds that caused Special Agent Watson's death.  The defendant armed himself with a knife, and was prepared to inflict fear and serious injury on his victims.  The defendant had, in fact, inflicted less serious injuries to victims on prior occasions.  In this case, the defendant used great force to plunge his knife into Special Agent Watson's torso, so much so that the knife penetrated Special Agent Watson's chest cavity and caused injury to his heart and lung.  These are the actions of someone with no regard for human life.  The Court must be concerned with addressing the defendant's actions, but also in protecting the public from an individual who would take a life in this manner.  This case is in United States court because Special Agent Watson was an internationally protected person.  A sentence of 65 years is appropriate in this case because Special Agent Watson, like the defendant's other victims, was a person.

### B.  A Sentence of 65 Years is a Just Punishment and Provides Adequate Deterrence

A sentence of 65 years will deter the defendant and others from similar acts and is just punishment for the offense.  Prior to Special Agent Terry Watson's murder, "millionaire ride" robberies were ubiquitous in Bogota.  The term "paseo millonaire" was a common term and U.S. employees traveling to the United States were briefed on them as a possible threat.  The victim's murder in this case placed these types of crimes on the front page of the newspapers and

television reports for weeks. Indeed, this case continues to generate substantial interest from the Colombia media. The sentence imposed in this case must stand as a beacon to those who would commit this type of offense, either domestically or abroad. A sentence that is consistent with the sentencing guidelines will send a clear message to criminals at home or in Colombia (who are keenly aware of this case) that harsh sentences await if they purposefully (or accidentally) target a United States citizen for one of their crimes. Importantly, the imposition of the requested sentence will make would-be offenders think long and hard about inflicting bodily harm on victims.

The imposition of a 65-year sentence is a just punishment. This was not the defendant's first foray into kidnapping and robbing victims, and the defendant was fully prepared to inflict serious injury to victims during the course of kidnappings and robberies. The defendant decided to bring a knife on this occasion, and was prepared and willing to use force to subdue a victim who did not comply with the criminals' demands. A sentence of 65 years of imprisonment is a just punishment for someone who plunged a knife into the torso of another human, causing their death.

### C. Sentencing the Defendant to 65 Years in Prison Will Avoid Unwarranted Sentencing Disparities

The recommended sentence is in line with sentences imposed in other federal cases involving the kidnapping and murder of law enforcement agents. In the Fourth Circuit, District Courts most often impose life sentences on those defendants that murder law enforcement agents or federal employees. *See*, *e.g.*, *United States v. Locust*, 95 F. App'x 507 (4th Cir. 2004) (unpublished) (first degree murder of Park Ranger, resulting in a life sentence); *United States v. Nance*, 67 F.3d 298 (4th Cir. 1995) (first degree murder of Postal Service Employee, resulting in

sentence of life in prison); *Schoppel v. United States*, 270 F.2d 413 (4th Cir. 1959) (second degree murder of a guard at Lorton reformatory, resulting in life in prison for two defendants).

A review of cases from other circuits reveals similar results, with sentences ranging from 22 years to life.  *See*, *e.g.*, *United States v. Clemons*, 32 F.3d 1504 (11th Cir. 1994) (DEA agent murdered during carjacking, resulting in life in prison); *United States v. Lopez-Alvarez*, 970 F.2d 583 (9th Cir. 1992) (murder and kidnapping of DEA agent and informant, resulting in life sentence); *United States v. Alvarez*, 755 F.2d 830 (11th Cir. 1985) (ATF undercover agents murdered, three defendants convicted of second degree murder and sentenced to 30, 25 and 22 years in prison).  The requested sentence here is consistent with those imposed in other cases.  This defendant murdered Special Agent Watson during the course of a kidnapping and robbery, conduct that is closely akin to first degree murder.  A sentence of 65 years in prison would not create an unwarranted sentencing disparity.

## VI. Conclusion

For the reasons set forth above, the United States respectfully submits that a sentence of 65 years of imprisonment is warranted and just.

Respectfully submitted,

| | |
|---|---|
| Dana J. Boente | Leslie R. Caldwell |
| United States Attorney | Assistant Attorney General |
| | Criminal Division |

By: \_\_/s/_____     By: \_\_/s/_____

| | |
|---|---|
| Michael P. Ben'Ary | Stacey Luck |
| Assistant United States Attorney | Special Counsel |
| United States Attorney's Office | Human Rights and Special Prosecutions Section |
| 2100 Jamieson Avenue | Criminal Division, U.S. Department of Justice |
| Alexandria, VA 22314 | 1301 New York Ave., N.W. |
| Phone: (703) 299-3700 | Washington, D.C. 20005 |
| Fax: (703) 299-3980 | Phone: 202-514-5650 |
| michael.ben'ary2@usdoj.gov | stacey.luck@usdoj.gov |
| | Facsimile: (703) 549-5201 |

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 6th day of April, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the counsel of record.

      /s/
Michael P. Ben'Ary
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
michael.ben'ary2@usdoj.gov